## Richard S. Hallett v. Henry Peyton.

S. P. as the preceding case.

THIS case also came before the court on a bill of exceptions. The points relied on were, 1st, That the seal of a foreign vice admiralty court was not in itself any evidence; but, to make it so, required testimony on oath authenticating both the seal and the signature of the judge. 2d, That, of the certificate of registry, parol testimony could not be received, it being, under the act of congress, a record. The third was as to abandonment,

and the same as in Church v. Bedient, the next immediately preceding case.

Pendleton for the plaintiff. It is unnecessary to argue one of the exceptions, because the judge against whose opinion the bill was sealed, has acknowledged that he erred in admitting parol proof of the existence of the register. The second is of the utmost importance. Upon this we contend that the papers adduced could not be legal evidence, unless accompanied by proof which would authenticate the seal of the court, and hand of the judge, or show that the condemnation was a true copy of the original sentence. It may not, perhaps, be requisite to establish by witnesses, the contents of papers under the seal of a foreign court, and under the hand of the judge who presided in it, as to the facts which took place in such court; because it may be presumed that no judge would put his signature to an untruth. But whether it be his signature and the seal of his court, must be authenticated by testimony. The reason why seals of any courts are evidence, is because our own judges are presumed to be acquainted with them. This presumption is not extended to foreign tribunals, nor to their laws, which must be proved *. To allow foreign seals to prove themselves would open a wide field to fraud. In a case in Espinasse †, want of seaworthiness was not allowed to be proved by a copy of a survey. The act of congress, regulating the manner of authenticating records of judgments in sister States, is a high legislative authority to show a seal of a foreign court cannot be received in evidence, without proof of its being actually the seal of such court. Were it otherwise, the act would have been needless. If this is the case in regard to seals of the courts of the different states, it certainly will a fortiori be so in regard to seals of foreign admiralty tribunals. Even in Great Britain, the seals of their inferior municipal courts must be proved, for they are not in themselves any evidence. Gilbert's Law of Evid. by Loft, 22, shows, that seals of inferior courts must be proved by the oath of some persons to whom they are known. In Olive v. Gwin, Hard. 118, the seal of the grand sessions in Wales, was held no evidence, though the grand sessions is a court established by act of parliament. So in Green v. Proude, 1 Mod. 117, an exemplification of a recovery in ancient demesne, was held inadmissible without proof. An exemplification under the public seal of a foreign city was reject-

* Boehtlinck v. Schneider, 3 Esp. 58.
† Wright v. Barnard, 2 Esp. 700.

ed, when offered to establish the entry of goods at the custom-house. The King v. Mason, 8 Mod. 75. Nay, in Henry v. Adcy, 3 East. 221, it was held that proving the hand-writing of the judge was not sufficient in an action on a judgment rendered in Grenada, but that the seal ought also to be established. If this strictness will be required in England respecting the seal of a court in one of her own colonies, we ought to be still more strict here. In Bernardi v. Motteux\*, the court refused to allow proceedings of a foreign admiralty court to be read unless by consent. The reason is evident; they were not authenticated. We do not say the papers adduced shall in no case be evidence; we only insist they must be substantiated on oath, as copies of other writings are, when the originals cannot be produced, and if produced would be evidence. The true criterion as to seals of courts is, that where the law presumes them known to the judges, they prove themselves; where not, they must be proved. The point of abandonment has already been argued in the preceding cause; if on that we are correct, the judgment in this case must be reversed, however the court may think on the other exceptions.

* Doug. 574.

Caines contra. As the questions now made, come before the court on a bill of exceptions, it may not be amiss to advert to the nature of this mode of proceeding. In jury trials when a party denies a fact, he controverts it by evidence which goes to the jury. When he admits a fact to exist, but says it is not substantiated in the manner required by law to prove the issue, he excepts to the evidence, by insisting it cannot at that time, or in that way, be offered to the jury in support of the fact in issue. When a fact is admitted, and also that it is duly substantiated, and a party contends that though the fact is true, and well proved, the inferences from it, do not in point of law, maintain the issue, he demurs to the evidence. From hence it appears, that on a bill of exceptions, the person tendering it supposes the evidence true, but questions the competence or propriety of it. Money v. Leach, 3 Burr. 1765. Therefore the facts it contains can never afterwards be disputed\*. Show. Pa. Ca. 120. Bridgman and others v. Rowland Holt, and others. It follows also, (though the remark is not required by the present case) that on a demurrer to evidence, the court may make any and every inference which a jury might have drawn. Cocksedge v. Fanshaw, Doug. 131. 134. Here then the cap-

* This may perhaps be, because it is an acknowledgment on record.

ALBANY,
1804.

R. S. Hallett,
v.
Hen. Peyton.

ture, the condemnation, and the seal, are confessed, but the reception of them in evidence is denied, for want of being duly authenticated. The question then arises, whether a seal, purporting to be a seal of a foreign court of admiralty, shall be primâ facie evidence, without parol testimony of the seal and the signature of the judge? As conclusive it was not offered. As primâ facie, it was open to be rebutted: it is only in case this is not done, that it becomes of any avail. But its reception is argued against, from the danger of fraud to which it would expose, as seals and signatures might be counterfeited for every occasion. It may be answered that the difficulty of manufacturing seals, papers, and proceedings, with all the formulæ of judicial niceties, would be insurmountable; and if they could be overcome, the circumstance of an oath, in this age of depravity, would be no obstacle to their authentication. The danger then of fraud, is not one atom diminished by the precaution intended. The keystone of this reasoning is laid upon the idea of fraud; a supposition that the law never allows to be made. So little is it countenanced by any authority, that it is laid down in 2 Bac. Abr. New Ed. 600, a seal is better evidence than an oath. The rule however with respect to other foreign judgments, has been relied on, and a train of authorities, which it is not meant to dispute, have been cited, to show not only the seal of the court where pronounced, but the hand of the judge who presided, must be substantiated. One word will suffice for all these. They were, excepting the case from Espinasse, which was a notarial copy of a ship-carpenter's survey, cases of judgments in municipal and local tribunals, proceeding according to a particular code of partial and confined jurisdiction. The courts of law are therefore not supposed to be connusant of the seals of fora, acting under a system which they do not acknowledge. This is not the case here. Courts of admiralty are held in all countries under one and the same law, the law of nations, equally in force in all. The reason on which a judge of the supreme court is supposed to know the seal of a court of common pleas, is, that each is a court of the same jurisprudence; acting under the same system, on the same principles, and its jurisdiction running in the same country. Wherever the jurisdiction is acknowledged, the seal of the court is supposed to be known. If then it can be shown, that what takes place in a foreign court of admiralty, is recognized and

ALBANY,
1804.

R. S. Hallett,
v.
Hen. Peyton.

* S. C. 1 Vent.
32.

available of here, by process under the seal of such court, it follows that such seal must substantiate itself. In 1 Rol. Abr. 530. pl. 12, this is said to be the law. " If a Frizlander sue " an Englishman in Frizland before the governor there, and re- " cover against him a certain sum of money, which the Eng- " lishman, not having enough to satisfy, comes into England, " upon which the governor sends his letters missive" *(which are always under seal)* " into England, asking all the magis- " trates within the kingdom to cause execution of the said " judgment; the judge of the admiralty may execute that judg- " ment by imprisonment of the party, and he shall not be libe- " rated by the common law. For it is according to the law of " nations that the justice of one nation shall be aiding to the " justice of the other, and the one execute the judgment of the " other: and the law of England takes notice of this law, and " the judge of the admiralty is the proper magistrate for that " purpose, for he only has execution of the civil law within this " realm. Wier's case resolved upon a habeas corpus, and he " remanded." It is evident that in this case, the authority of the imprisonment, which was founded on the letters missive, must have been before the court. No mention is made of the manner in which they were substantiated. So in Jurado v. Gregory, 1 Sid. 418 *. " Where sentence is obtained in a foreign " admiralty, one may libel for *execution* thereof here, because " all the courts of admiralty in Europe are governed by the ci- " vil law, and are to be assistant one to the other, though the " matter were not originally determinable in our court of admi- " ralty." This case shows how fully admiralty jurisdiction ex- tends over all civilized countries. It marks too the distinction between judgments in those courts, and judgments in foreign municipal tribunals. In the admiralty a libel may be filed for *execution* here, of a judgment abroad, in the same manner as an action may be maintained on a judgment in the supreme court, to obtain the benefits of it without examining into the merits on which it was rendered. As then the jurisdiction of the law of nations is acknowledged here, the courts of admiral- ty act under that jurisdiction. The seals of these courts must be supposed to be known here, like the seals of all other courts proceeding under the same authority. But it is not merely the seals of courts under the law of nations that are received as evidence; the seals of the officers of that law are equally

good testimony. The seal of a foreign notary public is evidence. Wherever the jurisdiction of a court runs, its seal requires no evidence to prove it. Judgments in the courts of the United States, are therefore evidence when under the seal of the court where pronounced, without proving the seal or signature of the judge. In Jenkins v. Silas Pepoon, debt was brought on a judgment rendered by the district court of the United States, for the district of Massachusetts. On a plea of nul tiel record, the plaintiff's counsel offered an exemplification of the judgment under the seal of that court. It was objected on the part of the defendant, that the act of congress respected only judgments of state courts. That it did not provide for the admission of judgments in the courts of the United States; that therefore proof should be made of the seal, or of the matters exemplified. The court however admitted the record unanimously, on the principle that it was a court of general jurisdiction, its seal therefore to be noticed by all courts, as carrying in itself evidence of its own genuineness. Against the reasonings on behalf of the plaintiff, the argument from inconvenience alone would be irresistible. Suppose a capture, and the vessel condemned in Bombay, after the proceedings have been transmitted here, must they be sent back under a commission to be identified ? The delays, risks of miscarriage, and expense, would be intolerable. Another reason may be assigned why in the present case the seal need not have been proved. It was a collateral fact, immaterial to the point in litigation. The record of the sentence (if it may be so termed) was not in issue. Therefore a seal to it was not requisite to make it testimony. " There is a differ-
" ence between pleading a record, and giving it in evidence.
" If pleaded, and the issue nul tiel record, it must be sub pede
" sigilli, or the judges cannot judge thereof; but, where it is
" given in evidence on a collateral fact, if it be not under seal,
" the jury may find the same, if they have *other good matter of*
" *inducement* to prove it." White v. Pynder, Styles, 22. The same authority may be used against the second point, that a register of a vessel, is, by act of congress, a record, and does not admit of parol proof; for the register was not in issue. It was not the matter in contest. The interest was the only subject of litigation. The exception cannot mean that a register is a judicial record, because it must then be an absolute verity *,

ALBANY,
180·.

R. S. Ha·lett,
v.
Hen. Peyton.

* Co. Litt,
117. b.

F

ALBANY,
1804.

R. S. Hallett,
v.
Hen. Peyton.

\* Dickson v.
Fisher. 1
Black. Rep.
664.

† Register.
Act, Sect. 11.
16. 27.

never to be contradicted; not even admitting of proof that it once was wrong \*. If a ship's register be not a record in the strict technical sense of the word, it is not proof of the facts it contains. It can amount to nothing more than primâ facie evidence. That which we adduced was equally primâ facie testimony. Between two equals there can be no difference. Then why prefer the register? The same weight of evidence is in one case as the other. To establish that the register of a vessel cannot be a legal record, and therefore that proof aliunde of it, and its contents, may be resorted to, the very act itself, under and by which it was created, is an authority. Navigating contrary † to the ownership expressed in the register, is by the provisions of the statute, a forfeiture of the vessel. On an information for such a breach of the revenue law, the facts contained in the register are the very subject of dispute. An instrument then, the facts in which are controverted by other facts, and go to a jury trial, can never be a legal record. When the question is as to the qualification of the vessel, as to what privileges and immunities she may demand, then the register may be the only evidence allowable: but to determine to whom the vessel belongs, it is only, e pluribus unum. The effect of a register may be illustrated by the following case. Suppose an act passed, authorizing commissioners to grant to persons swearing themselves entitled to lands, certificates, on production of which they should have a right to vote at elections. This certificate would be conclusive evidence of their right of suffrage, but would never establish their title to the lands. A doubt may be entertained how far the register is evidence at all. It is obtained on the oath of the party himself. It is contrary to legal principles to allow a party to testify in his own cause; this however is done in the fullest degree, without even the chance of cross examination, if the register granted on his oath, is evidence of the facts he has sworn to. But allowing the register to be evidence, as the original is at the custom-house where granted, a copy only could have been produced. This copy would not have proved any thing of itself; it must have been corroborated by the affidavit of some one who had compared it with the original, and would have taken all its effect from the oath. In the present case, the same sanction is afforded, for the witness swears to seeing the original in the name of the plaintiff below. The very fact,

then, which the copy would have established, has been substantiated by oath. But where a deed is lost, a simple copy without witnesses, and unsupported by affidavit, will be allowed in evidence *. 1 Lev. 25. A fortiori in such a case it may be proved by witnesses, that there was an original which they saw. Under our register act, however, it is to be observed, that the register is not a proof of property. The register may be in the name of one man, and the legal right of ownership in another. With us, the only consequence of a false recital of the owner's name, as it regards the property, is, that the vessel is not entitled to the privileges † of an American vessel. But under the British statute, a false recital renders the transfer null and void ‡, so that no property passes. Rolleston v. Hibbert, 3 D. & E. 407. Camden v. Anderson, 5 D. & E. 709. Westerdale v. Dale, 7 D. & E. 306. Moss v. Charnock, 2 East. 349. It was on the principle stated in the distinction taken, that the decisions in the cases cited entirely rested, no one of which was on a policy of insurance. In actions on these it is not necessary to prove a strict legal title. An equitable, nay, a possible interest is sufficient §. This appeared from the sentence acquitting the vessel as neutral, and from the proof of the citizenship of the now defendant. It is not said the proof was conclusive. It was primâ facie, enough to go to a jury, and if not rebutted, then it became conclusive. The object of the act was not to confer on registers the character of legal records ; it was to use them as mere memoranda, for the purpose of informing the custom-houses what tonnage-duty ought to be paid. This is further evinced by the act specifying what vessels shall sail under records, and what under registers. Under the former, are to navigate all those built in the United States, but owned wholly or partly by foreigners ; under the latter, all so built owned entirely by American citizens. The first pay 30 cents per ton, the other six. The word Record, when used therefore in our laws, signifies no more than an office memorandum. It is exactly synonimous. In our state law respecting mortgages, it is said to be unnecessary " to record or register at full length the certifi- " cate." 1 Rev. Laws, 480, sec. 4. So in the register act itself, sec. 9, the collector is ordered to " make and keep in some " proper book a record or registry thereof." The same in sec. 26, 7. So in the act to regulate the collection of duties

ALBANY, 1804.

R. S. Hallett, v. Hen. Peyton.

* The copy, in this case, was of an old deed, and was found among the muniments of the estate. It was observed also in the case, that many of the old deeds were without witnesses.

† Register Act, Sect. 14. ‡ 26 G. 3. c. 60. S. 17.

§ Lucena v. Craufurd, 3 Bos. & Pul. 75.

ALBANY,
1804.

R. S. Hallett,
v.
Hen. Peyton.

on imports and tonnage, sec. 21, collectors, naval officers, and surveyors, are directed to keep " true accounts *and* records" of all their transactions. 4 Laws Unit. Sta. 315. Being coupled with the word accounts, shows the meaning of the term, noscitur a socio. If the appellation of a record is, whenever applied to any writing in a statute, to give it the force and efficacy of a legal record, what a host of judicial records of absolute verity shall we have! Every permit, every custom-house paper, would be a record. For records must be so either in the legal, or the vernacular acceptation of the word. There is no third or hermaphroditical sort, partaking of the natures of both. Whenever a record is ordered by an act to be made of any transaction, if it is to have any peculiar weight as evidence, that weight is always declared. Thus, in our state law, relating to the proof of wills in the court of common pleas : " and " the record of the said will so proved and recorded, shall be " as good and effectual in all cases, as the original wills would " be if produced and proved." 1 Rev. Laws, 179, sect. 6. So ibid. 317, sec. 7, relative to the records by surrogates : " Which records shall be of the same force as the like records " in the office of the judge of the court of probates of this " state." So the certificates given to paupers by their towns, when filed and *recorded* by the town clerk where they come to reside : " Every such certificate, so acknowledged or proved, " and allowed as aforesaid, shall be deemed in all courts what- " soever within this state as duly proved, and shall be taken as " evidence without any other proof thereof." 1 Rev. Laws, 570, sec. 12. The laws of the union are in exact coincidence on this point with our own. By the act imposing a direct tax, 4 Laws Unit. Sta. 174, sec. 6, the absence of commissioners from meetings is to be recorded and noted in a book, together with their excuses for not attending, the transcripts from the records of which are " declared to be conclusive and legal evi- " dence." By the 25th sec. of the same statute, page 187, the alienations of lands assessed, are to be recorded. Does this shut out all proof of title, by any thing less than matter of record ? The truth is, that acts prescribing registers and records, do not abrogate proof by any other mode. Therefore, though the 26th G. 2. c. 33, sec. 13, ordains that a registry shall be kept of marriages, it does not exclude the presumptive evidence arising from cohabitation. 4 Bac. Abr. new Edit. 537. In

'the next place, when transactions in foreign states are to be es-
'tablished, there is some relaxation in the rule as to adducing
the best evidence the circumstances could afford. In Wallis
v. Delancey, cited in Barnes v. Trampowsky, 7 D. & E. 266,
on a bond, the hand-writing of *one* witness only was proved.
With regard to the other, there was no evidence that he was
either dead or abroad. The defendant contended it was not
the best evidence the case would furnish. Lord Kenyon.
" This is a foreign transaction. The proof *might be more per-*
" *fect*, yet it was sufficient and reasonable evidence for a jury,
" at least, unless *rebutted* by some evidence on the other side.
" The expense in sending a commission would, in many in-
" stances, be more than the value of the sum in dispute."
There is not a word in this decision which does not apply to
the present case. On the score of inconvenience argued
against the first exception, it is conclusive. On the point of
presumptive and primâ facie evidence, it is parallel ; for the in-
dividual states, with respect to each other are foreign coun-
tries, under distinct and independent sovereignties. The ex-
ceptions appear to urge as erroneous the admission of parts of
the proceedings in the admiralty under the seal of that court.
It has not been insisted on in argument, but it may not be im-
proper to observe, that so much only of a record as concerns
the matter in question, need be given in evidence. To prove
the filing of a declaration, it surely is not necessary to show the
writ. The whole end of the exceptions before the court, is to
gain a new trial. On this subject, if the same considerations
can be here entertained, it is laid down, that they are not grant-
ed on nice and formal objections, which do not go to the real
merits. 3 Black. Com. c. 24. So if the verdict of the jury be
agreeable to equity and justice, the court will not grant a new
trial, though there may have been an error in the admission of
evidence, or in the direction of the judge. Wilkinson v.
Payne, 4 D. & E. 468. The conduct of the plaintiff in error
determines the justice of the case. He does not deny, nay, by
the course he has taken, he confesses the facts offered in testi-
mony. He does not rebut, or offer to do away the presump-
tion arising from them, and therefore we may say, stabit pre-
sumptio donec probetur in contrarium.

Pendleton in reply. The rule of law is, that all evidence
'ought to be at the trial. What the weight of that evidence

might be, cannot be now taken into consideration. The only point is, was it properly received? Therefore, however the facts are admitted, no advantage can arise in this court upon those admissions. Nothing has been said to show the proof of the seal of the vice-admiralty court ought to have been dispensed with. That courts here may be applied to for execution of an admiralty sentence, is not law, and would be ridiculous in any country. The whole train of argument, as to evidence of the register, goes upon the idea of its having been lost; but as the vessel was restored, the presumption is, her papers were with her, and in the power of the plaintiff, who ought therefore to have produced the one granted by the custom-house at Charleston, or have shown why that could not be had. On any ground, therefore, we presume a new trial must be granted.

Per curiam delivered by Lansing, Chancellor. The plaintiff in error relies upon two points, for the reversal of the judgment rendered in the supreme court in the first of these causes. His counsel have stated them, and insisted—1st, That the brig John, having been released fourteen days before the abandonment, *the mere ignorance of the owners of that circumstance*, could not give them the right of abandoning the brig to the insurers, which it was admitted they could not have done, if they had known the real truth on the subject. And, 2dly, That the money received by the owners for the brig, ought to have been deducted from the same, as the underwriters were liable to pay, and the assured entitled to recover, only for the difference between that sum and the sum insured. These questions, it appears, arose at the trial of the cause at the sittings, and the Judge who presided, decided the suit on the authority of the case of Mumford v. Church, which was very fully and ably argued, while I was in the Supreme Court, in July Term, 1799; and, after much deliberation, the whole court united in opinion, that the abandonment was conclusive. My note-book is not now within my reach. I cannot therefore resort to it to refresh my memory, but I have a copy of the case which was stated by the parties in that cause, and from that it appears, that the policy was on the brig Betsey, which sailed from New-York for Petit-Guave, in the island of Hispaniola, on the 12th May, 1798; that she was captured by a British cruiser on the 26th day of the same month of May, and sent into Port Mole St. Nicholas, where she was detained three

weeks, and then restored upon paying charges; and that, after a further detention of three weeks, she was permitted to depart, but under a British convoy to Jamaica, from whence she returned to New-York. The abandonment was made the 12th June. The restoration had, not taken place when the abandonment was made; for the capture was on the 26th May, the abandonment on the 12th June, and three weeks from the former of those days, during which the litigation with the captors was pending, clearly over-reached the period of the abandonment. The notes which Mr. Justice Kent took on the subject, and which I have examined since the argument of these causes, show, that this was particularly adverted to by the court. If, therefore, the opinion given on that occasion was expressed with the latitude intimated, it was so far as it was beyond what the circumstances of the case required, extra-judicial; and, as such, it would not now be considered as authority in the court, which pronounced it. The general reasoning resorted to in the decision of cases, is sometimes calculated to mislead; but whenever it becomes necessary to examine them as authority, it must be rigidly restrained to the existing case. That the decision in this cause was supposed to be broader than it appears upon examination to have been; and that it was so received, is evident from the case of Slocum v. Burling, determined in October term, 1799. In this a question arose on a policy insuring a cargo which was captured, liberated, and afterwards abandoned, before notice of the liberation had been received. That case was decided without argument, expressly on the authority of that of Mumford v. Church; and on the general ground, that an abandonment once made was definitive. So were the present cases at the sittings. I however think that these cases are in no respects similar to that of Mumford v. Church; and that, even in the supreme court, they would still be considered as embracing an open question. In most occasions of maritime insurances, the remoteness of the owners from the subject insured, effectually precludes from a direct personal agency in its management, on the spot to which it may be conveyed, by any of the incalculable variety of incidents to which this species of adventure is so pre-eminently exposed. To obviate some of the inconveniences arising from this circumstance, they are sometimes permitted to act, upon the best

information they are able to acquire of the actual situation of the subject insured, and to make such information the basis of the rights they intend to assert, in consequence of the occurrence of any of those accidents, which, in their effect, produce either *a technical or actual total loss*. But certainly, if the information is either totally unfounded, or materially variant from the truth, it would be a strange position to maintain, that its resemblance, should be preferred to the truth itself. If the insurers and insured had been at the port to which the captors carried the brig, an abandonment, under all the circumstances of this case, could not have been permitted; for at the time it was made the vessel was restored, and prosecuting its destined voyage. From the mere act of abandonment, no positive right can be derived to the insured, unless it be combined with a total loss; for if the loss should, in the final event, prove an average, instead of a total loss, the act of abandonment would be nugatory. In these cases, the loss is not pretended to be deduced from the deterioration of the vessels; the first policy was underwritten for $5000, the repairs of the vessel amounted to about $800, and the full freight from New-York to Cadiz, was paid by the captors; the amount of this loss, calculated from the comparative value of the subject insured, with the amount of the repairs, clearly, *on that ground only*, would constitute an average loss. That this is the doctrine adopted in Great-Britain, and which still obtains there, appears from some of the cases cited. In the case of Goss v. Withers, it was made a point, whether the assured had or had not *a right to abandon*, after the ship had been recaptured and carried into Milford harbour. The capture was assumed, as primâ facie constituting a total loss. The salvage amounted to half her value; the loss of freight, the captivity of the master and mariners, the dissolution of the charter party, and the disability of the vessel to pursue her voyage, are reasons given by the court, from which the continuance of the total loss was to be inferred, and on that ground *only*, and not because the capture constituted a total loss, was the judgment of the court given. In the case of Hamilton v. Mendes, which arose on a policy on the ship Selby and her cargo, from Virginia or Maryland, to London; the ship had been captured, recaptured, and carried into Plymouth, where

2 Burr. 683.

2 Burr. 1198.

she arrived on the 6th day of June, 1760, and was offered to
be abandoned, at London, on the 23d of the same month.
The ship had sustained no damage from the capture, and the
whole cargo was delivered to the freighters, at the port of
London, who paid the freight.   Lord Mansfield, in deliver-
ing the opinion of the court, observed, that the ship and car-
go, in the case of Goss v. Withers, were literally lost.   He ex-
plains the words quoted from his opinion in the latter case :
" that there is no book, ancient or modern, which does not
" say, that in case of the ship being taken, the insured may
" demand for a total loss, and abandon," and adds, " but the
" proposition was applied to the subject matter, and is certain-
" ly true, provided the capture or the total loss occasioned
" thereby, *continue to the time of abandoning and bringing the*
" *action.*"   He afterwards lays it down, as the point intended
to be determined, *that the plaintiff upon a policy, can only re-*
*cover an indemnity, according to the nature of his case,* at the
time of the action brought, or at most, at the time of the of-
fer to abandon, and observes, that the plaintiff's demand is
for an indemnity.   His action, then, must be founded on the
nature of his damnification, as it really was, at the time of
the action brought.   It is repugnant, upon a contract of in-
demnity, to recover as for a total loss, when the final event
has determined that the damnification is in truth, *an average*
*loss only.*   This reasoning is adopted, after an elaborate re-
search, after solemn argument, and deliberate examination of
the theories of foreign jurists, and after a critical review of
the opinion given in the case of Goss v. Withers.   From
these circumstances, as well as from the great talents and abi-
lity that so eminently distinguished the tribunal which decid-
ed those cases, they merit particular attention, and are well
entitled to be considered as very weighty authority.   They
would have been respected as such anterior to the revolution,
and, in the estimation of our courts, that authority has not
been weakened by the change of government.   The doc-
trines deducible from these cases, go the length of determin-
ing these ; for they fully establish the position, that a capture
may, according to circumstances, either produce a total or
partial loss ; as, therefore, the actual loss in the first instance, is
less than one-sixth of the valuation of the brig in the policy,
the abandonment could be founded only on a *partial loss,*

G

ALBANY,
1804.

R. S. Hallett,
v.
Hen. Peyton.

Doug. 219.
1 D. & E. 187.
Cazalet v.
Barbe.

which of consequence, was incapable of constituting a case to warrant it. The case of Mills v. Fletcher, was decided since the revolution, on the point, that if the owner suffers so much from a capture, that it is not worth his while to pursue the voyage, he may abandon ; and the reasoning in the case of Goss v. Withers, and Hamilton v. Mendes, is again recognized and enforced. I have therefore no doubt, but that these cases ought to be governed by those of Goss v. Withers, and Hamilton v. Mendes, as well on the ground of authority as the cogency of the reasons given for those decisions. As before the abandonments, the event of discharge of the vessels had constituted an *average loss only*, the defendants are not entitled to recover as for a total loss. In forming this opinion, I have not brought into view those of the foreign jurists, cited in argument. In many instances, it is useful to resort to them, to elucidate general principles ; but the occasional infusion of the spirit of local codes into their general system, renders it sometimes difficult to discriminate accurately the degree of weight which ought to be attached to these opinions, on the principles they treat of. In these cases, I do not think it necessary to enter into an examination of their doctrines, as the court can repose themselves on judicial opinions, derived to us as authority. But if it were necessary, from the slight glance which has been offered, I am persuaded they are capable of being reconciled, and that they would tend to corroborate the general result drawn from the cases adjudged in the English courts. As to the second point, in the case first argued, thinking as I do, that the first concludes against the defendant in error, if my opinion would prevail, it would not be necessary to decide on this ; I shall however very briefly state my opinion on the second point also. If this was the case of a total loss, the defendants in error, by abandoning, completely divested themselves of their interest, and as they afterwards sold the vessel, if the abandonment was valid, they of course disposed of property which the act of abandonment unequivocally determined, was that of the plaintiff. This is not the case of mutual dealing, but the sum received is the price of the subject, for the damnification of which a compensation is demanded. It is a charge inseparably connected with that subject, calculated to diminish the amount of the compensation, and the forms of law must be exceedingly rigid and

unbending, to preclude the plaintiff, (the defendant in the court below) from entitling himself to a deduction of the amount of the sale. I therefore think this, without notice of a set-off, a proper ground for deducting the amount of the sale, after adjusting all reasonable allowances from the sum demanded by the defendants in error, and that the evidence to that point, ought to have been admitted. I am therefore of opinion, on both points, that the judgments in these causes should be reversed.

ALBANY,
1804.

R. S. Hallett,
v.
Hen. Peyton.

The whole court being unanimous in this opinion, the judgments in both causes were reversed, on the point of abandonment.